**TEMPLE UNIVERSITY—OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION**

v.

**John F. WHITE, Jr., et al.**

**Civ. A. No. 88–6646.**

United States District Court,
E.D. Pennsylvania.

Feb. 21, 1990.

Matthew M. Strickler of Ballard, Spahr, Andrews & Ingersol, Philadelphia, Pa., for plaintiff.

Kate L. Mershimer, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

By Memorandum and Order dated January 24, 1990, 729 F.Supp. 1093, I ruled that Pennsylvania's plan for funding hospitals' Medicaid costs did not comply with the requirements of the federal statute, and would have to be revised. I left open for further proceedings the question of what, if any, interim relief should be provided plaintiff Temple University, pending final adoption of a satisfactory plan by the defendants. These questions have now been addressed in further briefing, and at a hearing held February 20, 1990.

■ I have concluded that Eleventh Amendment considerations preclude mandating additional payments on a retroactive basis—*i.e.*, recalculating payments made to plaintiff before January 24, 1990. The Federal Government is responsible for 56%

of these costs, but the Commonwealth treasury is the source of payment of 44% of these costs. Thus, unlike the situation in *Bennett v. White*, 865 F.2d 1395 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989), upon which plaintiff relies, to require the defendants to seek increased retroactive allocations of federal funds (which should and would have been provided if Pennsylvania's plan fully complied with the federal statute) would inevitably require direct payments (to the extent of 44%) from the state treasury—a result precluded by Eleventh Amendment jurisprudence.

■ This should not mean, however, that the defendants can await the eventual adoption of a revised plan without taking any steps to avoid further unnecessary damage to plaintiff from continued implementation of the defective plan at the funding levels which have been determined not to satisfy federal requirements. Although the task of framing an acceptable Medicaid plan must be left to the defendants, once this court's jurisdiction has been invoked, it is appropriate to grant interim relief to mitigate irreparable loss which the plaintiff would otherwise suffer, pending final action on a revised plan.

Under the present plan, plaintiff's current payment rate is $2695.51. Plaintiff earnestly contends that full compliance with the requirements of the federal statute (*i.e.*, full payment of costs experienced by efficient hospitals), would require that the rate be increased to $4380.32. The defendants suggest that, at most, the $2695.51 figure should be increased by 11.6% (by eliminating part of the "budget neutrality" reduction which produced the current rate); this would produce a payment rate of $3,008.19.

While it is entirely possible that, when the Pennsylvania plan has been revised in order to bring it into full compliance with the federal statute, Temple's calculations may prove to be substantially correct, I am not prepared to make any such assumptions at this early stage. It is preferable, I believe, to establish an interim payment level based upon eliminating only the most obvious and clearcut inadequacies of the present plan.

One of the principal defects in the present plan is the lack of homogeneity among hospitals assigned to Class 1. If the lowest-cost, most dissimilar, institutions are eliminated from that group for purposes of calculating the rate, the remaining seven hospitals seem reasonably homogeneous in all significant respects. If only those seven hospitals are included, the basic rate would be $3,084.23 (rather than the $2,805.85 figure which serves as the starting point under the present plan). Adjusted for inflation since 1987, using only the defendants' adjustments, the base rate becomes $3,265.66. I recognize that Temple makes a persuasive argument that the defendants' inflationary adjustments are incorrect; but I believe such refinements are best left to the final revisions of the plan, and that some allowance should be made for the (faint, in my view) possibility that the new grouping unduly favors plaintiff.

A second major problem with the existing plan is its use of the arbitrary budget neutrality reduction of 14%. While it is probable that this factor should be eliminated altogether, it is conceivable that as much as 2.4% could be justified (based upon assumed differences between projections and actual costs). Applying a 2.4% budget neutrality factor, the base rate becomes $3,187.28. With the agreed "capital add-on", the figure becomes $3,311.90.

The final question is what adjustment should be made for the fact that plaintiff serves a disproportionate share of indigent patients. The statute permits the defendants either to adopt the Medicare formula for that adjustment, or to devise their own appropriate adjustment. If the Medicare formula were applied, the disproportionate share add-on would be 21.37%. The existing plan uses, instead, a 2.5% figure. I remain convinced, as set forth in my earlier Memorandum, that Congress intended disproportionate share institutions to receive an adjustment in the same ball park as the Medicare calculation would produce, but without limiting the states to that precise

formula. Regardless of the correctness of that view, when the state, without explanation or justification, provides a disproportionate share add-on of only 2.5%, it cannot be said to have made due allowance for the situation of a disproportionate share institution.

The plaintiff argues that, since the State has not provided an acceptable alternative calculation of the disproportionate share add-on, the court should enforce the other alternative sanctioned by Congress, namely, the disproportionate share add-on which the Medicare formula would produce. I do not believe, however, that this would represent the best interim solution; the defendants, too, must deal with budgetary shortfalls.

Although the 21.37% suggested by Medicare will not be mandated, it does seem to me that, even on an interim basis, the disproportionate share add-on should be not less than 10%. Stated otherwise, it is utterly unrealistic to suppose that the actual incremental costs associated with Temple's disproportionate share status are much less than one-half of what Medicare would estimate them to be.

Applying the 10% disproportionate share add-on produces a final payment rate of $3,643.09. The defendants will be ordered to apply that rate with respect to all bills paid or to be paid on or after January 25, 1990, pending defendants' submission of their revised plan.

█ The defendants have requested that, in the event interim relief is ordered, plaintiff be required to post security, guaranteeing repayment in the event the interim payments ordered by this court exceeds the amounts ultimately determined to be appropriate. Given the ongoing relationship between plaintiff and the defendants, however, it is reasonable to suppose that the defendants would be able to recapture any such excessive payments, by additional reductions in future payments, in the unlikely event that becomes necessary. I believe it is inappropriate to make a bad situation worse for both sides, by imposing upon plaintiff the additional expense associated with obtaining a surety bond which, as a practical matter, would be of little real benefit to the defendants.