50 F.3d 129
 63 USLW 2584, 47 Soc.Sec.Rep.Ser. 240,
Medicare & Medicaid Guide P 43,105
 NEW YORK CITY HEALTH & HOSPITALS CORPORATION; Medical
Society of the State of New York; Sidney Finkel;
and John A. Bleski, Plaintiffs-Appellees,
and
Benedictine Hospital, et al.,
Plaintiffs-Hospital-Intervenors-Appellees,
and
Midwood Ambulance & Oxygen Service, Inc., et al.,
Plaintiffs-Ambulance-Intervenors-Appellees,
v.
Cesar A. PERALES, as Commissioner of Social Services of the
State of New York, Defendant-Appellant,
Louis W. Sullivan, as Secretary of the United States
Department of Health and Human Services, Defendant.
 No. 227, Docket 93-6306.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 3, 1994.
Decided March 10, 1995.
 
 Judy E. Nathan, Asst. Atty. Gen. of N.Y.; New York City (G. Oliver Koppell, Atty. Gen. of N.Y.; New York City, of counsel), for defendant-appellant.
 Peter F. Nadel, New York City (David A. Florman, Rosenman & Colin, New York City, of counsel; Jay G. Safer, LeBoeuf, Lamb, Greene & Macrae, New York City of counsel), for appellees.*
 Jay G. Safer, New York City (LeBoeuf, Lamb, Greene & Macrae, New York City, of counsel; Peter F. Nadel, David A. Florman, Rosenman & Colin, New York City, of counsel), for appellees.*
 Before: LUMBARD, CARDAMONE and MINER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The Eleventh Amendment is at the center of this appeal. We recognize the always existing tension between the supremacy of federal law and the limitation on federal judicial power--established by the Eleventh Amendment--that enshrines the states' sovereign immunity. Eleventh Amendment jurisprudence has dealt with these conflicting concepts by using notions of an ongoing wrong, remedied prospectively, contrasted with a past wrong for which compensation is sought, termed retroactive relief. The contrast between prospective relief, permitted under the Eleventh Amendment, and retroactive relief, barred by that Amendment, is far from that between day and night. It is more like examining a subject in that half-light called the gloaming, where to identify it accurately one needs to have the instincts of Argos, Odysseus' dog, who recognized his master dressed as a beggar upon his return home after 20 years' absence. Homer, The Odyssey 196-97 (W.H.D. Rouse trans., 1937).
 
 
 2
 Defendant Cesar A. Perales (Commissioner), as Commissioner of the New York State Department of Social Services (DSS or Department), challenges two orders of the United States District Court for the Southern District of New York (Lowe, J.), that construe the Department's obligations to plaintiffs New York City Health & Hospitals Corporation, Sidney Finkel, John A. Bleski, et al. (plaintiffs or health care providers) under a prior judgment of the district court. The orders, reported at 833 F.Supp. 353 and 1994 WL 17945 respectively, require the Commissioner to provide full Medicaid reimbursements to plaintiffs for medical services that were performed prior to the date of the district court's judgment, but for which reimbursement claims were not filed with DSS until after the date of judgment.
 
 
 3
 The parties agree that the retroactive-prospective dichotomy of relief permissible under the Eleventh Amendment hinges upon when, as a result of being unable to recover a certain portion of their fees, the injury to health care providers occurs. Whether injury occurs upon the date health care providers render the service for which reimbursement is due or whether the injury occurs when an invalid regulation is applied to deny them their full reimbursement is the question we must answer.
 
 BACKGROUND
 
 4
 Plaintiff New York City Health and Hospitals Corporation is a New York public benefit corporation created by the State of New York. It is a principal provider of hospital services for low-income patients in New York City. The other plaintiffs are hospitals, individual doctors, an organization of doctors and a provider of ambulance services, each of which provides health care services in New York State. All of the plaintiffs provide services for dually eligible and other qualified beneficiaries under the Medicare and Medicaid Acts. Defendant Cesar A. Perales, the Commissioner of DSS, is the New York State official responsible for the operation of the Medicaid program in New York, and defendant Louis W. Sullivan, a named defendant who has been succeeded by Donna E. Shalala, as Secretary of the United States Department of Health and Human Services (HHS), is the person who oversees Medicare and Medicaid at the federal level.
 
 
 5
 I Dual Eligibles and the Invalid Regulation
 
 
 6
 To properly understand the issue on this appeal, it is helpful to review briefly the facts of a predecessor case, New York City Health and Hosp. Corp. v. Perales, 954 F.2d 854 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). That case challenged a New York regulation, 18 NYCRR Sec. 360-7.7 (1989), that effectively eliminated health care providers' right to be paid reasonable compensation upon treating poor Medicare patients. In accepting plaintiff's position we struck down the just cited New York regulation as violative of the Medicare Act, Title XVI-II of the Social Security Act, 42 U.S.C. Secs. 1395-1395ccc, and the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. Secs. 1396-1396v. See Perales, 954 F.2d at 855.
 
 
 7
 Medicaid, a joint federal and state funded system in which New York State participates, subsidizes medical care for the needy, regardless of age. A state wishing to participate in Medicaid proposes a plan that includes, among other things, a schedule of payment rates that the state designates for various kinds of medical care. The plan must then be approved by the Secretary of HHS. Upon the Secretary's approval of a state's plan, the federal government assists the state in its reimbursement program, supplying federal Medicaid funds. Health care providers willing to treat Medicaid patients must agree to accept the designated Medicaid rate for their services and not ask the patient to pay additional money.
 
 
 8
 Medicare is a federally funded medical insurance program for persons who are 65 years of age and older and certain disabled individuals. Medicare "Part A" covers 100 percent of the reasonable inpatient hospital costs. In addition, people who are Medicare-eligible may voluntarily obtain supplementary insurance--known as Medicare "Part B"--for additional medical care, including certain physician services, hospital outpatient services, and other health services not covered under Part A. As is the case with private insurance, a Medicare-eligible person must pay insurance premiums for Part B coverage. Under Part B, the federal government pays 80 percent of the reasonable costs and charges of covered services. Reasonable costs and charges are established pursuant to the Medicare Act and regulations. In addition to premiums, Part B insureds are responsible for paying the annual deductible and the remaining "coinsurance" amount, i.e., 20 percent of reasonable costs and charges of covered services. See 954 F.2d at 856.
 
 
 9
 Medicare and Medicaid protection occasionally overlap, generally for poor elderly and disabled individuals who are eligible under both programs. Congress recognized that the poor Medicare-eligible generally would not be able to afford to enroll in the optional Part B Medicare coverage because they would be unable to pay the insurance premiums, the annual deductible, and the 20 percent coinsurance. The Medicare Act therefore provides that a state may agree to pay Part B insurance premiums on behalf of such poor elderly and disabled--known as "dual eligibles" or "crossovers"--and thereby assist such individuals to acquire Part B coverage. See 42 U.S.C. Sec. 1395v (1988 & Supp. V 1993), as elaborated by 42 C.F.R. Sec. 407.40-407.50 (1993). These dual eligibles are accordingly enrolled in the Medicare Part B program by the state just as less needy individuals enroll themselves when they choose to obtain Part B coverage and pay their own insurance premiums. The federal government contributes funds to subsidize these state "buy-in" arrangements. New York has such a buy-in agreement with the Secretary.
 
 
 10
 Up until 1987 New York paid the premiums, the annual deductible, and the 20 percent copayment for buy-in dual eligibles. As of January 1 of that year New York altered its practice by promulgating the predecessor of Sec. 360.7-7, the regulation at issue in Perales. The regulation provided that in the case of dual eligibles covered by Part B through a buy-in agreement, "New York [would] not pay any cost-sharing amounts [annual deductible and copayments] except ... [w]hen the 80% of reasonable costs or charges that Medicare reimburses amounts to less than the Medicaid rate, [in which case] New York [would] pay the difference."[1] New York City Health and Hosp. Corp. v. Perales, 833 F.Supp. 353, 356 (S.D.N.Y.1993). The regulation also prohibits health care providers from collecting any money from buy-in crossovers themselves. The principal effect of the regulation was that in New York State a dual eligible's health care providers almost never collected more than 80 percent of their reasonable costs or charges, because the scheduled Medicaid payments were invariably less than 80 percent of the corresponding reasonable costs or charges of a given type of service under Medicare. See Perales, 954 F.2d at 857.
 
 
 11
 Plaintiffs, as health care providers, brought suit against defendants, the Commissioner of DSS and the Secretary of HHS, in 1987 challenging the regulation on the grounds it violated the Medicare Act and the Medicaid Act. The district court granted summary judgment to the defendants. Upon appeal, we ruled the state regulation violated both acts, and reversed and remanded the case to the district court for entry of summary judgment in favor of the plaintiffs. Perales, 954 F.2d at 863.
 
 II The District Court's Judgment and Orders
 
 12
 The district court thereafter entered judgment on June 3, 1992 granting plaintiffs' motion for summary judgment. The judgment stated:
 
 
 13
 18 N.Y.C.R.R. Sec. 360.10 [the predecessor regulation] and Sec. 360-7.7 (the "Regulations") ... are hereby declared to be unlawful and null and void to the extent the same authorize or permit the State of New York to pay less than the full deductible and coinsurance liability incurred under Title XVIII of the Social Security Act for qualified Medicare beneficiaries, including persons dually eligible for benefits under Titles XVIII and XIX of the Social Security Act ("QMBs"); [and]
 
 
 14
 [ ] Defendant Commissioner of Social Services of the State of New York, ... is hereby enjoined from implementing the Regulations to the extent set forth above and ... is hereby directed to cause the State of New York to pay the full deductible and coinsurance liability incurred under Title XVIII of the Social Security Act for QMBs....
 
 
 15
 The Commissioner complied with the judgment, but only for services rendered on or after June 3, 1992, taking the position that full reimbursement for services rendered prior to the judgment would be retroactive relief that under the Eleventh Amendment the district court was barred from ordering. This is so, contended the Commissioner, because the state's obligation to reimburse health care providers accrues upon the rendering of the services.
 
 
 16
 Plaintiffs sought to hold the Commissioner in contempt of the judgment, believing they were entitled to payment for claims properly submitted after June 3, 1992 even though services were rendered prior to that date. Plaintiffs argued the "real injury" occurs at the time the regulation is brought into play for the purpose of denying their claims. Hence, they believe ordering full payment of claims submitted after June 3, 1992 would be prospective relief.
 
 
 17
 Noting that "[t]he question is a close one," 833 F.Supp. at 359, the district court, in an order dated September 12, 1993, found the injury occurred upon the processing of a claim for reimbursement "according to a regulation that has been found unlawful." Id. at 360. Therefore, the trial court concluded, it was not ordering the payment of state funds as compensation, but rather, ordering state officials to conform their conduct to the requirements of federal law. Id. The trial court stated that the judgment entered on June 3, 1992 "encompassed all claims that were properly submittable on June 3, 1992," id., and because the Commissioner's policy violated that judgment it held the Commissioner in contempt, id. at 362.
 
 
 18
 In an order dated January 12, 1994 the district court modified its opinion, finding the Commissioner not in contempt since the underlying law on enforceability of the judgment, that is, the Eleventh Amendment issue, was unclear. New York City Health and Hosp. Corp. v. Perales, No. 87 Civ. 4896 (MJL), 1994 WL 17945, at * 3 (S.D.N.Y. Jan. 18, 1994). Nonetheless, the trial court stated the Commissioner was still obligated to pay all claims properly submitted after June 3, 1992 for services rendered prior to that date.
 
 
 19
 The Commissioner appeals from the September 12, 1993 and January 12, 1994 orders construing the Department's obligations to reimburse health care providers fully for services rendered prior to June 3, 1992. We agree with the Commissioner and accordingly reverse.
 
 DISCUSSION
 
 20
 Plaintiffs maintain that the district court correctly determined that the injury to them occurs when the state applies the regulation and thereby limits their total reimbursement to the higher of 80 percent of the reasonable charge for the provided service or the applicable Medicaid rate. On this theory the judgment enjoining use of the regulation for pre-June 3, 1992 services simply requires the Commissioner, when processing future reimbursement claims, to conform his conduct to the dictates of federal law. The Commissioner insists, to the contrary, that the state's liability to health care providers accrues on the actual date the service is rendered and that the submission, verification and payment of claims are administrative formalities necessary to receive payment on a liability that has already accrued. On this competing theory, the judgment requires an adjustment of the amount the state must pay on a previously accrued claim, retroactive relief that a federal court lacks the power to impose by virtue of the Eleventh Amendment.
 
 
 21
 Examining this question in light of the history and purpose of the Eleventh Amendment, we think the injury to health care providers occurred on the date services were rendered. Since the district court ordered plaintiffs reimbursed for previously rendered services, such relief is retroactive--measured from the date of the trial court's order--and is therefore barred by the Eleventh Amendment.
 
 I The Eleventh Amendment
 
 22
 It will serve the purpose of the following discussion to explore the place the Eleventh Amendment occupies in our republican system of government. At the time of the Constitution's ratification the prevailing view of many of the Framers, expressed in their speeches and writings to a concerned and somewhat skeptical public, was that the federal judiciary's power to adjudicate cases involving states, which retained their sovereignty in the federal system, was contingent upon a state's consent. See Edelman v. Jordan, 415 U.S. 651, 660 & n. 9, 94 S.Ct. 1347, 1354 & n. 9, 39 L.Ed.2d 662 (1974), (citing Monaco v. Mississippi, 292 U.S. 313, 323-25, 54 S.Ct. 745, 748-49, 78 L.Ed. 1282 (1934)).
 
 
 23
 The comments of Alexander Hamilton, writing in the Federalist, illustrate the flavor of the Framers' argument: "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union." The Federalist No. 81, at 529 (Alexander Hamilton) (Sherman F. Mittell ed.) (emphasis in original). Sovereign immunity, Hamilton goes on to say, remains with the States and the danger of it being lost is fanciful, and to conclude the federal courts could destroy the States' pre-existing right of sovereign immunity is "altogether forced and unwarrantable." Id. at 530.
 
 
 24
 Despite this widely expressed view and the reliance many of the states placed on it when ratifying the Constitution, a number of the Supreme Court's earliest cases involved suits adjudicated against states. See Edelman, 415 U.S. at 660-62, 94 S.Ct. at 1354-55. The culmination of these cases--demonstrating the validity of public skepticism in the face of powerful political rhetoric--was the decision of the Supreme Court in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). There the Court held that it had jurisdiction over a suit instituted by the estate of a citizen of South Carolina against the State of Georgia for materials that had been furnished during the Revolutionary War, but for which he had not been paid. The states were so shocked by the prospect that they could be brought into federal court to pay their Revolutionary War debts, an occurrence that would result in their financial ruin, see Hess v. Port Auth. Trans-Hudson Corp., --- U.S. ----, ---- & n. 9, 115 S.Ct. 394, 400 & n. 9, 130 L.Ed.2d 245 (1994), that a ground swell to reverse Chisholm led to swift passage of the Eleventh Amendment, see Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 97, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) (Chisholm "created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted" (quoting Monaco, 292 U.S. at 325, 54 S.Ct. at 749)).
 
 
 25
 The Eleventh Amendment, which has not been amended since its adoption, provides:
 
 
 26
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 27
 While the Amendment does not address the subject of suits against a state by its own citizens, the Supreme Court has long held that an unconsenting state is immune from suit in federal court by her own citizens. See Hans v. Louisiana, 134 U.S. 1, 14-15, 18-19, 10 S.Ct. 504, 506-07, 508-09, 33 L.Ed. 842 (1890). This is so because the fundamental constitutional principle of the sovereign immunity of the several states, "of which the Amendment is but an exemplification," holds that the judicial power granted to federal courts does not extend, absent the state's consent, to suits against it by private parties, whether they be citizens of another state, a foreign state, or even citizens of its own state. Ex parte New York, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921). Thus, the doctrine of sovereign immunity serves to limit the power granted the federal judiciary under Article III of the Constitution. See Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 425-26, 88 L.Ed.2d 371 (1985).
 
 
 28
 It is also well established that the Eleventh Amendment's containment of federal judicial power is not restricted to actions where the state is a named defendant, but extends further to those actions where liability, if imposed, must be paid from the state fisc. See Edelman v. Jordan, 415 U.S. at 665, 94 S.Ct. at 1356-57. "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).
 
 
 29
 As a result of this restraint on federal jurisdiction, a state may be sued in federal court only when it consents in express terms to such a suit or when Congress, pursuant to a valid exercise of its power, unequivocally states its intent to abrogate the states' immunity. See Green v. Mansour, 474 U.S. at 68, 106 S.Ct. at 425-26. The important exception to this general principle of a valid suit lying against a state only by its consent was created by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). That case allowed a federal court challenge to the constitutionality of a state official's action in enforcing state law. It teaches that the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law when such is necessary to vindicate the supremacy of that law, see Pennhurst, 465 U.S. at 102, 104 S.Ct. at 908-09, but this exception does not encompass the grant of retroactive monetary relief, see Edelman v. Jordan, 415 U.S. at 668, 94 S.Ct. at 1358.
 
 
 30
 From all of this it may be seen that principles of Eleventh Amendment law attempt to strike a balance between the states' sovereign immunity and the supremacy of federal law. See Pennhurst, 465 U.S. at 105, 104 S.Ct. at 910. A balance has been brought about by jurisprudential rules that permit prospective relief and bar retroactive relief. "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring supremacy of that law." Green v. Mansour, 474 U.S. at 68, 106 S.Ct. at 426. But compensatory or deterrence interests do not relate sufficiently to upholding the supremacy of federal law so as to outweigh the interest of protecting the immunity afforded the sovereign states under our republican form of government. See id.
 
 
 31
 The bounds of this workable balance do not mean the Eleventh Amendment is to be read as precluding prospective relief having a future financial effect on a state treasury, even if the amount is substantial. See Milliken v. Bradley, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977). Nor does the Amendment bar certain monetary awards, like attorney's fees or fines, which are matters ancillary to a grant of prospective relief against a state. See Missouri v. Jenkins, 491 U.S. 274, 280, 109 S.Ct. 2463, 2467-68, 105 L.Ed.2d 229 (1989); Hutto v. Finney, 437 U.S. 678, 690-92, 98 S.Ct. 2565, 2573-74, 57 L.Ed.2d 522 (1978). What the Amendment forecloses is an award of money required to be paid from state funds that compensates a claimant for the state's past violations of federal law. The Supreme Court capsulized this in Edelman, stating the award in that case was invalid because it was "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 U.S. at 668, 94 S.Ct. at 1358. To the extent that a suit against a state sought to extract money for an accrued liability, as distinct from a suit seeking the expenditure of state funds for future compliance with a grant of prospective relief, Edelman held the Eleventh Amendment barred suit against a state.
 
 
 32
 II The Nature of the Judgment and Subsequent Orders
 
 
 33
 With a firm understanding of the differing constitutional treatment accorded requests for prospective and retroactive relief, we turn to an analysis of the relief sought here. Recognizing that it is the nature of that requested relief, not the label placed on it, which determines its availability in light of the Eleventh Amendment, see Edelman v. Jordan, 415 U.S. at 666, 94 S.Ct. at 1357, the parties give us two distinct perspectives on the relief granted in the district court. According to the Commissioner, the state's obligation to reimburse health care providers under Medicaid accrues upon the date of service, even though certain administrative functions remain to transform the state's obligation into a cash payment. Given this position, the Commissioner contends that to the extent the judgment and subsequent orders appealed from address services rendered prior to June 3, 1992, they impermissibly seek to enforce accrued monetary liabilities of the state.
 
 
 34
 Plaintiffs, to the contrary, maintain the rendering of medical services, without more, does not create an enforceable obligation against the state for Medicaid reimbursement. From this vantage point plaintiffs aver the state's obligation does not arise until a provider actually submits a claim for reimbursement; and, they continue, in processing such claims the state's duty to conform its actions to federal law is not breached until the state applies the regulation previously found invalid. Thus, plaintiffs conclude, application of the judgment to claims properly submitted after June 3, 1992, for medical services provided prior to that date, does not implicate the Eleventh Amendment's protection of the state's sovereignty because the judgment and subsequent orders restrict only future or prospective conduct of the Commissioner.
 
 
 35
 Plaintiffs' proposition does not rest comfortably in the reality of the Medicaid schemes or in Eleventh Amendment jurisprudence as it has been applied to Medicaid reimbursement disputes. In the first place, the mechanism established by the Medicaid regulations reveals that the state's liability--even though a sum certain has not been fixed--accrues on the date of service. For instance, in order to obtain reimbursement a provider must have been enrolled as such on the date of service and the patient too must have been eligible for the service as of that date. See, e.g., 18 NYCRR Sec. 504.1(b)(1) (1994) ("Any person who furnishes medical care, services or supplies for which payments under [Medicaid] are to be claimed ... must enroll as a provider of services prior to being eligible ... to arrange for such care, services or supplies...."); id. Sec. 504.6(c) (1991) ("A provider's participation [in Medicaid] may begin only on or after the date specified in the notification of acceptance."); id. Sec. 360-2.4(c) (1992) ("A retroactive authorization will be issued for medical expenses incurred during the three months prior to the month of application for [Medicaid], provided the applicant was eligible in the month in which the medical care and services were received."); id. Sec. 360-7.5(a)(5) (1991) (similar). In addition, the rate established for the service provided is the rate applicable on the date of service, regardless of an increase or decrease in that rate at the time the claim is processed. See 18 NYCRR Sec. 360-7.5(a) (1990) ("payment for services or care [is to] be made, at the [Medicaid] rate or fee in effect at the time such services or care were provided"). Further, as the state convincingly points out, a system of liability based on the date of service assures that all similarly situated providers will be treated alike, and not have payment rates based on the fortuitous timing of claim submission.
 
 
 36
 In addition to the structure of New York's regulatory scheme and the inherent logic in reimbursing equally those health care providers providing the same services on the same day, decisional law in other circuits supports the view that liability accrues--and therefore any injury due to inadequate reimbursement in the future occurs--on the date of service. In Kimble v. Solomon, 599 F.2d 599 (4th Cir.), cert. denied, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979), the Fourth Circuit was faced with deciding the appropriate relief where the State of Maryland instituted certain reductions in Medicaid benefits without complying with federal notice requirements. Id. at 601. The court noted that, were it not limited by the Eleventh Amendment, relief for this violation could be retroactive for eligible recipients who obtained medical services despite the reductions, because they would be paid benefits for such services in accordance with pre-reduction state law, and relief could be prospective for recipients receiving services subsequent to the court's order, because they would be paid benefits under pre-reduction law until a legal reduction of benefits was effected. Id. at 604. However, the Kimble court held, retroactive relief would be barred by the Eleventh Amendment because the state's "obligation to pay these benefits arose at the time the treatments were received.... [Therefore,] payments for these past medical services would be tantamount to the award of an accrued monetary liability...." Id. at 604-05 (internal citations omitted) (emphasis in original). Prospective relief would be permissible since it "requires payments only for medical services received after entry of the district court's decree." Id. at 605.
 
 
 37
 In Wisconsin Hospital Ass'n v. Reivitz, 820 F.2d 863 (7th Cir.1987), the Seventh Circuit dealt with a Wisconsin statute imposing a Medicaid reimbursement rate freeze. Id. at 865. Wisconsin's Medicaid plan called for reimbursement to hospitals at the end of the year based on certain calculations. To ease the hospitals' financial burden, reimbursement was provided for at interim rates throughout the year, subject to later adjustment. The Wisconsin statute in question reimbursed hospitals for the first three months of their fiscal year at the rate applicable to the hospital's previous fiscal year. Id. at 865. Analogously to plaintiffs' contention in the case before us, the plaintiffs in Reivitz contended that the relief they sought--a direction to the defendants to ignore the invalid statute in deciding how much money to pay the hospitals--was prospective, because no final settling up for the year had yet been made. Id. at 867. The Seventh Circuit rejected this argument, stating that to order funds paid from the state treasury to provide higher payment for services provided before the date of the court's injunction was beyond its authority because of the limitation of its power under the Eleventh Amendment. Id. We agree with the reasoning of the Fourth and Seventh Circuits in the cases cited.
 
 
 38
 Finally, we address plaintiffs' misplaced reliance on our decision in Tekkno Laboratories, Inc. v. Perales, 933 F.2d 1093 (2d Cir.1991). In Tekkno Laboratories, the Commissioner withheld payment of claims to Tekkno pending a review and verification of their propriety. Id. at 1094. The district court granted Tekkno's motion for a preliminary injunction prohibiting the withholding of payment. Id. at 1095. In overturning the grant of an injunction, we held that the order to the Commissioner to repay funds withheld prior to the date of the injunction was an exercise of power violative of the Eleventh Amendment. Id. at 1098. Seizing on our comment that the district court's order "could have had some prospective effect if Tekkno had submitted new claims after" the date of the order, the instant plaintiffs contend that Tekkno Laboratories stands for the proposition that the proper boundary between retroactive and prospective relief is the date of claim submission.
 
 
 39
 This contention ignores the difference in Tekkno's underlying claim from the claim before us now. We held there that the Eleventh Amendment barred the district court from directing the state to release moneys subject to withholding. Although the injunction could have required payment on future claims, it had no such effect because no new claims were submitted and Tekkno had been later terminated as a Medicaid provider. There claim submission was the dividing line between retroactive and prospective relief because the issue was the propriety of DSS withholding payments pending review not, as here, whether a particular service underlying a claim was reimbursable at a particular rate.
 
 
 40
 Moreover, that the Department can delay making payment while a claim is verified does not change the underlying fact that the verification must consider the facts and reimbursement regulations in existence when the service was provided.[2] The fact that administrative requirements must be satisfied before the amount of reimbursement is finally established and subsequently paid does not change the actuality that the state's liability accrues on the date of service.
 
 CONCLUSION
 
 41
 For the foregoing reasons, we reverse the orders of the district court to the extent that they interpreted the district court's judgment entered June 3, 1992 to apply retroactively to services rendered prior to that date, and remand for the district court to issue an order in accordance with this opinion.
 
 
 
 *
 Filed a joint brief for Appellees
 
 
 [1]
 The regulation had been modified to extend to a group of Medicare-eligible patients who are not poor enough to qualify for Medicaid, but who have incomes at or below the poverty line. This group is referred to as "qualified Medicare beneficiaries" (QMBs). 42 U.S.C. Secs. 1396d(p)(1), 1396d(p)(2)(A). The QMBs may, like dual eligibles, be provided with Part B coverage through a buy-in agreement. 42 U.S.C. Sec. 1396d(p)(3). The modified regulation limits New York's contribution to QMBs' cost-sharing coverage in the same way it does that of dual eligibles, on the basis of Medicaid rates. Therefore they will be referred to in this opinion as if they were one group
 
 
 [2]
 Plaintiffs also rely on Temple Univ. of the Commonwealth System of Higher Educ. v. White, 732 F.Supp. 1327 (E.D.Pa.1990), aff'd, 941 F.2d 201 (3d Cir.1991), cert. denied, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). In Temple University the district court ordered the defendants to reimburse the plaintiff hospital at a court-ordered interim rate for "all bills paid or to be paid on or after" the date of its order finding the reimbursement scheme invalid. Id. at 1329. Since the Third Circuit did not discuss the retroactivity of that part of the order applying to previously provided services, we do not consider it to have held contrary to the position we have adopted