TEMPLE UNIVERSITY,
Plaintiff–Appellee,

v.

John F. WHITE, Jr., Eileen M. Schoen, David S. Feinberg, David D. Ulsh, G. June Hoch, Defendants–Appellants.

ALBERT EINSTEIN MEDICAL CENTER, Allegheny General Hospital, Children's Hospital of Pittsburgh, Episcopal Hospital, Giuffre Medical Center, Magee–Womens Hospital, Mercy Catholic Medical Center–Misericordia Division, Mercy Hospital of Pittsburgh, Montefiore Hospital Association of Western Pennsylvania, Inc., Presbyterian University Hospital of Pittsburgh, St. Christopher's Hospital for Children, St. Joseph's Hospital, St. Mary Hospital, Western Pennsylvania Hospital, Germantown Hospital and Medical Center

v.

WHITE, John F., Jr., as Secretary of Public Welfare, Hershock, Michael H., as Secretary of the Budget

John F. White, Jr. and Michael H. Hershock, Appellants.

FRANKFORD HOSPITAL

v.

WHITE, Jr., John F., Secretary of Public Welfare, Schoen, Eileen M., Deputy Secretary for Medical Assistance Programs, Feinberg, David S., Director of the Bureau of Policy and Program Development of the Office of Medical Assistance Programs, Ulsh, David D., Acting Director of the Division of Inpatient Programs of the Office of Medical Assistance Programs, and Hershock, Michael H., Secretary of the Budget

John F. White, Jr., Eileen M. Schoen, David S. Feinberg, David D. Ulsh and Michael H. Hershock, Appellants.

HAHNEMANN UNIVERSITY HOSPITAL and Presbyterian Medical Center of Philadelphia, and the Trustees of University of Pennsylvania

v.

WHITE, John F., Jr., Secretary of Public Welfare, Schoen, Eileen M., Deputy Secretary for Medical Assistance, Feinberg, David S., Director of the Bureau of Policy and Program Development of the Office of Medical Assistance, and Ulsh, David D., Acting Director of the Division of Inpatient Programs of the Office of Medical Assistance and Hershock, Michael H., Secretary of the Budget

John F. White, Jr., Eileen M. Schoen, David S. Feinberg, David D. Ulsh, and Michael H. Hershock, Appellants.

HOSPITAL ASSOCIATION OF PENNSYLVANIA, Allegheny Valley Hospital, the Allentown Hospital, Allentown Osteopathic Medical Center, J.C. Blair Memorial Hospital, Braddock General Hospital, Bradford Hospital, Brandywine Hospital, Butler Memorial Hospital, Carbondale General Hospital, Central Medical Center and Hospital; Chambersburg Hospital, Chester County Hospital, Chestnut Hill Hospital, the Children's Hospital of Philadelphia, Charles Cole Memorial Hospital, Clarion Osteopathic Community Hospital, Clearfield Hospital, Community General Osteopathic Hospital, Community

Medical Center, Conemaugh Valley Memorial Hospital, Divine Providence Hospital, Divine Providence Hospital of Pittsburgh, Doylestown Hospital, Dubois Regional Medical Center, Ephrata Community Hospital, Eye & Ear Hospital of Pittsburgh, Forbes Metropolitan Health Center, Forbes Regional Health Center, Franklin Regional Medical Center, Frick Community Health Center, Geisinger Medical Center, Geisinger Wyoming Valley Medical Center, the Germantown Hospital and Medical Center; Gettysburg Hospital, Gnaden Huetten Memorial Hospital, Good Samaritan Hospital, Greene County Memorial Hospital, Hamot Medical Center, Hanover General Hospital, Harrisburg Hospital, Highlands Hospital and Health Center, Indiana Hospital, Hameson Memorial Hospital, Jeannette District Memorial Hospital, Jefferson Hospital, Andrew Kaul Memorial Hospital, Kensington Hospital, Lancaster General Hospital, Lankenau Hospital, Lee Hospital, Lehigh Valley Hospital Center, McKeesport Hospital, Meadville Medical Center, the Medical Center, Beaver, Pa., Inc., Medical College of Pennsylvania, Memorial Hospital, Memorial Hospital of Bedford, Mercy Catholic Medical Center, Fitzgerald Mercy Division, Mercy Hospital, Altoona, Methodist Hospital, Millcreek Community Hospital, Monongahela Valley Hospital, Muhlenburg Hospital Center, Northeastern Hospital of Philadelphia, North Penn Hospital, Osteopathic Medical Center of Philadelphia, Pennsylvania Hospital, Phoenixville Hospital, Pottstown Memorial Medical Center, Pottsville Hospital and Warne Clinic, Punxsutawney Area Hospital, the Penn State Hospital/the Milton S. Hershey Medical Center, Quakertown Community Hospital, Reading Hospital and Medical Center, Roxborough Memorial Hospital, St. Agnes Medical Center, St. Francis Medical Center, St. Joseph's Hospital, Carbondale, St. Joseph Hospital, Lancaster, Sacred Heart Hospital, Sewickley Valley Hospital, Shadyside Hospital, Sharon General Hospital, Southern Chester County Medical Center, Suburban General Hospital, Sunbury Community Hospital, Taylor Hospital, Tyler Memorial Hospital, Tyrone Hospital, Westmoreland Hospital Association, Wilkes–Barre General Hospital, the Williamsport Hospital & Medical Center, and York Hospital and Greenville Regional Hospital, Altoona Hospital, Bloomsburg Hospital, Brownsville Hospital, Bryn Mawr Hospital, Canonsburg Hospital, Carlisle Hospital, Citizens General, Community General Hospital, Reading, Community Hospital of Lancaster, Crozer–Chester Hospital, Delaware County Memorial Hospital, Easton Hospital, Ellwood Hospital, Grand View Hospital, Jeanes Hospital, Jersey Shore Hospital, J.F. Kennedy Hospital, Lower Bucks Hospital, Metro Health Hospital, Metropolitan Hospital, Central, Metropolitan Hospital, Parkview, Metropolitan Hospital, Springfield, Montgomery Hospital, Paoli Hospital, Pocono Hospital, Sacred Heart Hospital, Chester, Saint John's Hospital, Hazelton–Saint Joseph's Medical Center, Saint Joseph Hospital, Reading, Saint Luke's Hospital, Saint Margaret Memorial Hospital, Saint Vincent's Hospital, Suburban Hospital, Titusville Hospital, Uniontown Hospital, Washington Hospital and the Wayne County Memorial Hospital.

v.

WHITE, John F., Jr., as Secretary of Public Welfare, Department of Public Welfare, Commonwealth of Pennsylvania, Hershock, Michael H., in his official capacity only as Secretary of the Budget, Department of the Budget, Commonwealth of Pennsylvania, Franklin, Carolyn, in her official capacity only as Western Regional Representative of Public Welfare, Department of Public Welfare, Commonwealth of Pennsylvania, Hughes, Patricia, in her official capacity only as Southeastern Regional Representative of Public Welfare, De-

partment of Public Welfare, Commonwealth of Pennsylvania

John F. White, Jr., Carolyn Franklin, Patricia Hughes and Michael H. Hershock, Appellants. (Two Cases)

TEMPLE UNIVERSITY,
Plaintiff–Appellee,

v.

John F. WHITE, Jr., Eileen M. Schoen, David S. Feinberg, David D. Ulsh, G. June Hoch, Defendants–Appellants.

Nos. 90–1112, 90–1203 to 90–1206, 90–1244, 90–1661.

United States Court of Appeals, Third Circuit.

Argued Jan. 10, 1991.

Decided July 30, 1991.

As Amended Sept. 23, 1991.

Ernest D. Preate, Jr., Atty. Gen., Kate L. Mershimer, Senior Deputy Atty. Gen. (argued), Gwendolyn T. Mosley, Calvin R. Koons, Senior Deputy Attys. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen. of Pa., Harrisburg, Pa., William D. Lenahan, Asst. Counsel, Dept. of Public Welfare, Harrisburg, Pa., for appellants John F. White, Jr., Eileen M. Schoen, David S. Feinberg and David D. Ulsh.

Matthew M. Strickler (argued), Jenny P. Shulbank, Ballard, Spahr, Andrews & Ingersoll, George E. Moore, of counsel Temple University, Philadelphia, Pa. for appellee in 90–1112 and 90–1244.

Jeffrey B. Schwartz, David M. Doret, Mark H. Gallant (argued), Alan G. Rosenbloom, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for amicus in 90–1112 and 90–1244 and for appellees in 90–1203.

Jennifer A. Stiller (argued), Elizabeth A. Read, Patrick K. McCoyd, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa. for appellees in 90–1204 and 90–1205.

Roland Morris (argued), Jack M. Mumford, Paula G. Sanders, Duane, Morris & Heckscher, Harrisburg, Pa., for appellees in 90–1206.

Henry W. Sawyer, III (argued), James Eiseman, Jr., Drinker Biddle & Reath, Philadelphia, Pa., for appellee Sacred Heart Medical Center in 90–1661.

Before COWEN, ALITO and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This set of six consolidated appeals arises from the challenges, raised by over 140 Pennsylvania hospitals, to the validity of Pennsylvania's payment rates that the Commonwealth has set pursuant to its obligations under the Medicaid Program, Title XIX of the Social Security Act. 42 U.S.C.A. § 1396 *et seq.* (1983 & West Supp.1991). The Medicaid Program, as it is described in *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1309 (2d Cir.1991), "establishes a joint federal and state cost-sharing system to provide necessary medical services to indigent persons who otherwise would be unable to afford such care."

Because Pennsylvania participates in the Medicaid Program, it must comply with the federal statutory and regulatory scheme which requires, among other things, that a participating state establish a Medical Assistance Program, ("MAP"), pursuant to which it pays hospitals for their inpatient treatment of Medicaid patients. *Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990). The hospitals involved in these appeals all

claim that Pennsylvania's 1988–1989 payment rates were inadequate to meet the substantive standards of Title XIX, and that the method by which the Commonwealth promulgated those rates did not comply with the requirements of that statute. Accordingly, the plaintiff hospitals argue that Pennsylvania's MAP, which established the 1988–1989 rates, must be voided.

### I

Temple University, ("Temple"), brought this § 1983 action in August of 1988, alleging that the Pennsylvania Department of Public Welfare, ("DPW"), was depriving Temple University Hospital of rights secured by Title XIX, 42 U.S.C.A. § 1396 *et seq.,* and the regulations thereunder.[1] Following a bench trial, the district court issued an opinion on January 24, 1990, holding that: (1) the Pennsylvania MAP payment rates were arbitrary because the procedure by which DPW grouped the hospitals for rate classification was unrelated to the efficiency or economy of the hospitals, and because Pennsylvania's across-the-board "budget neutrality" cut was entirely budget-driven and not justifiable; (2) the 2.5% add-on that DPW granted Temple for its status as a disproportionate-share hospital[2] was inadequate in light of the federal statutory requirement that Pennsylvania's MAP take into account the special circumstances of hospitals treating a disproportionate number of low-income patients; and (3) the process by which DPW adopted its MAP and rates did not comply with the federal statutory and regulatory requirements mandating that each participating state make meaningful findings as to the reasonableness and adequacy of the rates established and as to the State's add-ons for a hospital's disproportionate-share status. *See Temple University v. White,* 729

---

[1]. Any doubt that § 1396a(a)(13)(A) creates rights enforceable under § 1983 was laid to rest by the Supreme Court's ruling in *Wilder v. Virginia Hospital Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). *Wilder* held, among other things, that § 1983 does provide a cause of action for the substantive rights established in § 1396a(a)(13)(A).

[2]. A disproportionate-share hospital is one that, pursuant to statute, is entitled to receive additional payments because of its service to a disproportionate number of low income patients. *See infra* § II B (citing 42 U.S.C.A. § 1396r–4(b) (West Supp.1991)).

F.Supp. 1093, 1096–1101 (E.D.Pa.1990). The district court accordingly ordered DPW to bring the Pennsylvania MAP into conformity with federal requirements, and ordered further briefing as to the appropriate level of interim payments pending modification of the MAP. *Temple,* 729 F.Supp. at 1101.

On February 21, 1990, the district court awarded interim relief to Temple to mitigate the irreparable loss that Temple would otherwise suffer pending DPW's development of a new MAP. *Temple University v. White,* 732 F.Supp. 1327, 1328 (E.D.Pa. 1990). The district court established the interim payment rate by restructuring the group into which Temple had been placed to include only the seven most similar hospitals. The court also reduced the arbitrary "budget neutrality" adjustment from 14% to 2.4%, and raised the disproportionate share add-on to 10%. *Id.* at 1328–29. The district court ordered that "pending final revision of its Medicaid plan ... [DPW] shall, with respect to all of plaintiff's bills paid on or after January 25, 1990, utilize a payment rate of $3,643.09." (App. 31).[3] *See also Temple,* 732 F.Supp. at 1329. The district court did not require Temple to post a bond because of the ongoing relationship between the parties and the ability of DPW to recapture any excessive payments through reductions in future payments, if necessary. *Id.*

Meanwhile, the other hospitals involved in this appeal had filed similar suits against DPW, seeking essentially the same relief as Temple had sought. The district court entered its January 24 and February 21, 1990 orders in the Temple case while those cases were pending. Subsequently, the

other hospitals filed various motions for interim relief, and, on March 1, 1990, the district court entered an order granting relief in each of those pending cases.[4] The court granted relief "for the reasons stated in this court's rulings on interim relief in [*Temple*] (to the extent those reasons apply to all hospitals, without regard to their classification or other individual distinguishing features)." *See supra* note 4. The orders required DPW to apply a rate calculation in its payments to the hospitals that did not include any "budget neutrality" adjustment in excess of 2.4%, *id.,* the amount the court imposed in the *Temple* case after invalidating the 14% across-the-board cut as being arbitrary and solely budget-driven. 732 F.Supp. at 1328–29.

Subsequently, in August, 1990, while these cases were pending on appeal, Sacred Heart Hospital, a party to the *Hospital Association of Pennsylvania* case, filed an application with the district court, seeking emergency relief. Sacred Heart sought a $2 million advance from DPW against amounts expected as future payments for medical assistance under the MAP that DPW had been directed to promulgate. At the close of an August 14, 1990 hearing, the district court granted relief to Sacred Heart by entering a preliminary injunction requiring DPW to advance to Sacred Heart a total of $2 million to be paid in installments of $500,000, beginning ten days after the date of its Order and continuing thereafter at 30–day intervals. Transcript of Hearing of August 14, 1990 at 139; (SH App. 155). On October 5, 1990, the district court denied DPW's motion for a stay of this injunctive relief. *See Hosp. Ass'n of Pennsylvania v. White,* Unpublished Order, No. 88–9848 (E.D.Pa. October 15,

---

3. Citations to "(App.)" refer to the Appendix filed with this court by the appellants on March 26, 1990. Citations to "(Supp.App.)" refer to the Supplemental Appendix filed by the appellants on May 9, 1990. Citations to "(SH App.)" refer to the Appendix filed in case No. 90–1661, in relation to the award of emergency relief to Sacred Heart Hospital. *See infra* § V. Citations to "(SH Supp.App.)" refer to the Supplemental Appendix filed by the Appellees along with their brief in No. 90–1661 on November 21, 1990.

4. *Albert Einstein Medical Center v. White,* 732 F.Supp. 1329 (E.D.Pa.1990); *Frankford Hosp. v. White,* unpublished order, No. 88–8927 (E.D.Pa. March 1, 1990); *Hahnemann University Hosp. v. White,* unpublished order, No. 88–9132 (E.D.Pa. March 1, 1990); *Hosp. Ass'n of Pennsylvania v. White,* unpublished order, No. 88–9848 (E.D.Pa. March 1, 1990). The district court entered an identical order in each of these cases. See *infra* note 14 for the full text of these orders.

1990); (SH Supp.App. 3–6).[5]

## II

### A

The Medicaid law, Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 *et seq.*, authorizes federal financial support to states providing medical assistance to certain low income persons. In Pennsylvania, the federal financial contribution amounts to 56% of the costs of covered services. *Temple*, 732 F.Supp. at 1327–28.[6] Participation in Medicaid is optional, but once a state elects to participate, it must comply with all federal statutory and regulatory requirements. *Wilder*, 110 S.Ct. at 2513; *Harris v. McCrae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980).

States have historically paid hospitals the actual costs incurred in providing care to Medicaid recipients, regardless of disparities in costs or efficiencies among the respective hospitals. In 1981, Congress enacted the "Boren Amendment," *see* 42 U.S.C.A. § 1396a(a)(13)(A), which substituted for this mandatory "reasonable cost reimbursement" system the requirement that states must at least provide payments to hospitals:

> through the use of rates (determined in accordance with methods and standards developed by the State ... and which, in

the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ...) which the State *finds*, and makes assurances satisfactory to the Secretary, are *reasonable and adequate* to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality[.]

42 U.S.C.A. § 1396a(a)(13)(A) (emphasis added).

To qualify for federal funding, a state must submit a state plan—a MAP—for approval by the Health Care Financing Administration ("HCFA"), of the Department of Health and Human Services. 42 C.F.R. § 447.200 (1990). The MAP must "specify comprehensively the methods and standards used by the agency to set payment rates," 42 C.F.R. § 447.252(b); provide for the payment of rates which the state "finds" are "reasonable and adequate" to "meet the costs that must be incurred by economically and efficiently operated facili-

---

**5.** After oral argument, but before the filing of this opinion, we were informed that the parties had executed and filed, with the district court, a comprehensive document entitled "Stipulation of Settlement." In addition, Sacred Heart informed us that a special agreement had been entered into and filed with respect to its appeal at No. 90–1661. Supplemental submissions were then filed by the parties with this court addressed to the issue of possible mootness. We were advised of the highly conditional nature of the settlement, *see Coopers & Lybrand v. Livesay*, 437 U.S. 463, 465 n. 3, 98 S.Ct. 2454, 2456 n. 3, 57 L.Ed.2d 351 (1978), and were furnished with copies of the Stipulation of Settlement and the special Sacred Heart agreement.

We have supplemented the record on these appeals with these documents, and we have noted the various obligations placed upon the parties, compliance with which is required for each of the fiscal years, to and including June, 1993, at which date, if all terms have been met,

the parties have agreed that the actions be dismissed. Prior to that time, the Stipulation contemplates that DPW will make payments to the hospitals that exceed those which are required by the district court orders we review here.

We are satisfied that these appeals have not been mooted by the Stipulation and agreements of the parties, *see, e.g.,* Stipulation of Settlement p. 33, ¶ 6.5, and that disposition of the instant appeals should be had on the merits. *See Coopers & Lybrand*, 437 U.S. at 465 n. 3, 98 S.Ct. at 2456 n. 3. We, of course, express no view concerning the approval of the Stipulation of Settlement and the Sacred Heart agreement by the district court, inasmuch as neither the terms of the agreements nor their approval are the subjects of appeal before us.

**6.** See *West Virginia University Hosp. v. Casey*, 885 F.2d 11, 15 (3d Cir.1989), *aff'd in part*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (Court reviewed and affirmed only an issue as to attorneys' fees) [hereinafter *"WVUH"*], for a more detailed overview of Title XIX.

ties," 42 C.F.R. § 447.253(b); and contain "assurances" to HCFA that this standard has been satisfied. 42 C.F.R. § 447.253(a). HCFA relies on the state's "assurances" and does not independently evaluate the adequacy of the rates. At least annually, a state must make "findings" that assure the "reasonableness and adequacy" of its inpatient hospital rates. 42 C.F.R. § 447.253(b). It must also make findings "[w]henever the Medicaid agency makes a change in its methods and standards." *Id.*

### B

Through the fiscal year ending on June 30, 1984, the Pennsylvania MAP reimbursed hospitals based on their actual costs. In 1984, DPW, relying on the Boren Amendment, promulgated a revised MAP that provided for a change to a prospective payment system. (Supp.App. 446a).[7] Under that system, the operating costs of most acute care inpatient hospital stays are reimbursed by a flat payment per discharge that is a multiple of the hospital's "payment rate" and a "relative value" assigned to the diagnostic related group ("DRG") into which the particular case falls.

A hospital's payment rate depends on its peer "Group" category. DPW ranks all general hospitals (with the exception of children's hospitals), into seven approximately equally sized Groups based upon weighted ratings in each of four categories with the aim of roughly aligning hospitals with similar characteristics. *See* (Supp.App. 498a–501a). Each children's hospital comprises its own Group. Hospitals in Groups 1 and 2 and children's hospitals treat the largest volume of Medicaid recipients in the Commonwealth, and are, therefore, the most heavily dependent on MAP revenues to meet operating costs. (Supp.App. 603a–04a). Group payment rates are based on the weighted group average cost per case within each group that DPW de-

rives through a detailed computation. (App. 60–62); *Temple,* 729 F.Supp. at 1097.

Some hospitals also receive additional payments because of their service to a disproportionate number of low income patients. Pursuant to the statutory requirements, 42 U.S.C.A. § 1396r–4(b), DPW identified these disproportionate-share status hospitals, then arranged these hospitals into five groups defined by the percentage of their total days devoted to federally funded medical assistance patients. Hospitals in these five disproportionate share groups receive additional payments of .5%, 1%, 1.5%, 2%, or 2.5% above their regular payment rates.

For 1984, the first year that the prospective payment plan was operative, DPW structured the system to be "budget neutral," and applied an adjustment factor to limit aggregate payments to an estimate of what the old system's payments would have been. (Supp.App. 465a). After the regrouping of hospitals into their assigned groups pursuant to DPW's 1988–1989 MAP, DPW reduced the group average rates for all Groups by a uniform factor of approximately 14% to effect what DPW called a "budget neutrality adjustment." This 14% "lop off," (Supp.App. 568a–69a, 572a), was designed to restrict total MAP payments to the respective hospitals to the amount of the total inpatient budget appropriation for 1988–1989.[8]

### III

Title XIX requires states to set rates "which the State *finds,* and makes assurances satisfactory to the Secretary, are *reasonable and adequate* to meet the costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C.A. § 1396a(a)(13)(A) (emphasis added). We held, in WVUH, that the federal regulations implementing § 1396a(a)(13)(A) "unambiguously require the State to make findings" to support its

---

**7.** See *WVUH,* 885 F.2d at 15–16 and *Temple University v. White,* 729 F.Supp. 1093, 1095–99 (E.D.Pa.1990), for a more detailed description of Pennsylvania's prospective payment system.

**8.** By applying the 14% budget neutrality adjustment, the budget was reduced to $427 million from $497 million, the budget amount that otherwise would have been available. (App. 505); (Supp.App. 646a).

Medicaid plan. 885 F.2d at 30.[9] In so holding, we determined that Pennsylvania was not in compliance with the federal statute and regulations because it admitted to gathering no information as to the out-of-state hospitals' actual costs, and did no empirical analysis to measure the effects of the payment program on those hospitals and thus made none of the requisite findings. *Id.* at 30. The Supreme Court recently took note of this "findings" requirement in *Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2519 & n. 11, 110 L.Ed.2d 455 (1990). In response to an argument that Title XIX merely required that a state provide assurances to the Secretary that its rates comply with the statute, the Court emphasized that such an argument "ignores the language of the statute that requires a State to *find* that its rates" comply with the reasonable and adequate requirement, and that such findings are "a necessary prerequisite to the subsequent requirement that the State provide 'assurances' to the Secretary." *Id.* 110 S.Ct. at 2519 n. 11 (emphasis in original).[10] We review the issue of a state's compliance with Title XIX's procedural requirements under a plenary standard. *See WVUH,* 885 F.2d at 29–30.

More recently, the Second Circuit, in *Pinnacle Nursing Home,* addressed the procedural requirements of the Boren Amendment in the same context as we do here. 928 F.2d at 1313–14. The language of the *Pinnacle* opinion, referring to the need for findings, bears repetition:

> We decline the state's invitation to read the procedural requirements of the Boren Amendment as mere surplusage. The Supreme Court recently dispelled this notion, reconfirming that the procedural requirements of the Boren Amendment were intended to be observed.... In light of the abundant evidence demonstrating that Congress intended that the procedural requirements be followed, the state's argument that "findings" are not mandatory is fatally flawed. That conclusion is reinforced by the mandatory, rather than precatory, language of the statute itself. 42 U.S.C. § 1396a(a)(13)(A) ("[a] State plan for medical assistance *must*" provide for payment of rates which the state *finds* are reasonable and adequate (emphasis added)). Although procedural requirements may reduce some of the state's "flexibility" in determining their own schemes of reimbursement, this is what the plain language of the statute requires.

*Pinnacle Nursing Home,* 928 F.2d at 1313–14.[11]

9. Federal regulations specify that:
 (b) *Findings.* Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:
 (1) *Payment Rates.* (i) The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.
 (ii) With respect to inpatient hospital services—
 (A) The methods and standards used to determine payment rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs....
 42 C.F.R. § 447.253(b) (1990).

10. *See also AMISUB v. State of Colorado Dep't of Social Services,* 879 F.2d 789, 796 (10th Cir. 1989) (holding that "[t]he plain language of fed-

eral Medicaid law mandates the State Medicaid Agency, *at a minimum,* to make 'findings' which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.") (emphasis in original), *cert. denied,* —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); *Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291, 1294 (8th Cir.1985) (state must conduct objective analysis or study to support its findings and assurances), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987).

11. *Pinnacle* dealt with nursing homes that challenged adjustments made by the State of New York in connection with Medicaid reimbursements. Among other things, the Court of Appeals held that the adjustments to the Medicaid reimbursement plan were invalid because no findings were made which established a nexus between the cost of operating efficient and economical nursing facilities and the proposed re-

■ In the present case, then, DPW was required to find that its MAP complied with the three substantive requirements of § 1396a, *i.e.*, that (1) its rates take into account the circumstances of hospitals serving a disproportionate share of low-income patients; (2) its "rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital;" and (3) its rates are reasonable and adequate "to assure medicaid patients of reasonable access to inpatient hospital care." *WVUH,* 885 F.2d at 22.

The district court, however, found that DPW made no findings based upon empirical studies "on such matters, for example, as the characteristics of an efficient and economical hospital operation, the impact of the proposed reimbursement rates upon hospitals' ability to survive, etc.—but merely certified that its plan complied with the statutory requirements." *Temple,* 729 F.Supp. at 1100. DPW's study or investigation of its rate structure was limited to a few internally-generated reports that show which hospitals reported costs above or below the group rates and to some revenue projections indicating that, after the re-grouping of the hospitals and the recalculation of the rates, the projected revenues of some of the hospitals went up and the projected revenues of the other hospitals went down. (App. 327–29). DPW also took note of the fact that it had not received complaints about the inability of medical assistance recipients to obtain care. (App. 328).

Thus, DPW had conducted no analysis and had made no findings as to the reasonableness or adequacy of its rates to cover the costs of an efficiently and economically operated hospital or to account for the impact on a hospital of its across-the-board budget neutrality adjustment and varying percentage add-ons for disproportionate-share hospitals. Nor did DPW identify any findings which it made pertaining to "reasonable access to inpatient hospital care." Indeed, DPW admitted as much during pre-

imbursement rates. *Pinnacle Nursing Home,*

trial discovery. Temple posed the following interrogatory:

Identify any studies performed, findings prepared, or investigations conducted by DPW referring or relating to or evidencing the adequacy and reasonableness of the M.A. Program's inpatient hospital rates relative to costs for Fiscal Year 1989 (using Fiscal Year 1987 claims paid data Trended Forward for Inflation and without a Budget Neutrality Adjustment).

(App. 611). DPW's answer was:

No special studies, findings, or investigations were conducted by DPW referring or relating to or evidencing the adequacy and reasonableness of the MA Program's inpatient hospital rates relative to costs for FY 1989 (using FY 1987 claims paid data trended forward for inflation and without a Budget Neutrality Adjustment).

*Id.* DPW's failure to assemble information in making its decisions as to rates is reflected in the testimony of David Feinberg, an administrator in DPW responsible for "all medical assistance policy and other activities related to all inpatient hospital and outpatient providers who participate in medical assistance programs." (App. 298). Mr. Feinberg stated that "[w]e don't know, today, what hospital costs are. They have not been audited, so we don't know how close anybody is to [the various group rates]." (App. 312).

Without knowledge of hospital costs, DPW could not have known what an efficient and economical hospital operation would entail, let alone what payment rates would be reasonable and adequate to meet that hospital's costs and assure reasonable access to hospital care. In the absence of essential data and information, DPW was in no position to make findings, and clearly *did not do so.* Any assurances DPW made to the Secretary were, therefore, without foundation. Accordingly, as the district court held, DPW's MAP was not in compliance with federal law, specifically, § 1396a(a)(13)(A) and 42 C.F.R. § 447.-

928 F.2d at 1314–15.

253(b), as interpreted by our court and by the Supreme Court. *See WVUH*, 885 F.2d at 29–30; *Wilder*, 110 S.Ct. at 2519 & n. 11.[12]

The lack of critical and required findings mandates that we affirm the district court's holding that DPW's 1988–1989 MAP was invalid, and that DPW must promulgate a new MAP that complies with the procedural and substantive provisions of Title XIX. In accordance with the remedy that we afforded to West Virginia University Hospital, "[r]eimbursement to [Temple] under a prospective payment system that conforms to federal law will commence with the date of the district court's initial judgment in this matter." *WVUH*, 885 F.2d at 35. Any adjustment that becomes necessary as to the amount of the payments to be made to Temple pursuant to the district court's injunction is to be made either through additional DPW payments to Temple or by DPW's recoupment in future payments of any overpayments.

**12.** At oral argument, counsel for DPW insisted repeatedly that DPW had made findings in compliance with this requirement. Despite persistent questioning from the court, however, counsel failed to point to a single specific finding in the record that would satisfy DPW's obligations. Neither have we found such a finding in the documents and testimony to which counsel referred us on this point. *See, e.g.,* Transcript of Oral Argument of January 10, 1991 at 6–16. *See also id.* at 82. Counsel subsequently conceded outright that DPW had no "written findings." *Id.* at 86.

**13.** The injunctive relief ordered by the district court in its February 21, 1990 order reads as follows:

AND NOW, this 21st day of February, 1990, it is ORDERED:

That, pending final revision of its Medicaid plan in conformity with this court's Memorandum and Order of January 24, 1990, the defendants shall, with respect to all of plaintiff's bills paid on or after January 25, 1990, utilize a payment rate of $3,643.09.

IT IS FURTHER ORDERED that if it is later finally determined, either in this litigation or in the implementation of an acceptable revised medical assistance plan, that the amounts received by plaintiff pursuant to this Order are excessive, plaintiff shall promptly refund the excess, either by payment or by credit against future entitlement.

(App. 31).

IV

A

DPW challenges the "interim" injunctive relief that the district court awarded to Temple in its February 21, 1990 order,[13] and to the other hospitals, (hereinafter referred to as "Hospitals"), in its March 1, 1990 orders.[14] As an initial matter, DPW claims that the district court's orders providing interim injunctive relief are invalid because the district court erred in its liability determinations, which, as to Temple, were expressed in the district court's January 24, 1990 opinion, *Temple*, 729 F.Supp. 1093, and, as to the Hospitals, were expressed in the district court's March 1, 1990 orders. *See supra* note 14. We have earlier discussed the district court's merits/liability holding in *Temple*, and we are satisfied that the district court did not err in its analysis or in its holding that DPW did not meet the "findings" requirements of 42 U.S.C.A. § 1396a. *See supra* § III. DPW,

**14.** The order which the district court entered in each of the Hospitals' pending cases on March 1, 1990 reads as follows:

AND NOW this 1st day of March, 1990, upon consideration of the various pending applications for interim relief, and for the reasons stated in this court's rulings on interim relief in the case of *Temple University v. John F. White, Jr.,* C.A. 88–6646 ... (to the extent those reasons apply to all hospitals, without regard to their classification or other individual distinguishing features), it is ORDERED:

1. That, with respect to all plaintiffs, and with respect to all bills paid or to be paid on or after the date of this Order, the defendants shall apply a rate calculation which does not include any "budget neutrality" adjustment in excess of 2.4%.

2. This Order is without prejudice to other aspects of the pending applications for additional interim relief, or to further such applications.

*Albert Einstein Medical Center v. White,* 732 F.Supp. 1329 (E.D.Pa.1990). *See also Frankford Hosp. v. White,* unpublished order, No. 88–8927 (E.D.Pa. March 1, 1990), *reproduced in,* (Supp. App.30a); *Hahnemann University Hosp. v. White,* unpublished order, No. 88–9132 (E.D.Pa., March 1, 1990), *reproduced in,* (Supp.App.34a); *Hosp. Ass'n of Pennsylvania v. White,* unpublished order, No. 88–9848 (E.D.Pa. March 1, 1990), *reproduced in,* (Supp.App. 38a).

as noted above, however, also challenges that holding as it applies to the Hospitals.

Because the district court subsumed in its March 1 order the merits holding which it had reached in *Temple*, DPW is correct when it argues that the Hospitals have received the benefit of the Temple merits determination without having been parties to the Temple proceeding or the Temple trial. DPW is not correct, however, in its assertion that the reasons given in the district court's January 24, 1990 merits opinion, as they pertain to Temple, do not extend to the Hospitals.

 In this connection, the Hospitals call our attention to the doctrine of collateral estoppel. We have noted that this doctrine may be invoked where:

> (1) The issue decided in the prior adjudication was identical with the one presented in the later action;
>
> (2) There was a final judgment on the merits;
>
> (3) The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and
>
> (4) The party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action.

*Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir.1988) (citations omitted). *See also Parklane Hosiery v. Shore*, 439 U.S. 322, 324, 326–33, 99 S.Ct. 645, 649–53, 58 L.Ed.2d 552 (1979) (recognizing legitimacy of nonmutual offensive collateral estoppel as applied to give preclusive effect to previous federal court judgment).[15] DPW does not dispute that the issues raised by the hospitals in their related cases were raised, actually litigated, and decided against DPW in the *Temple* case. Neither does DPW dispute that it had a full and fair

opportunity to litigate those issues nor that the decision rendered on those issues in *Temple* constituted a valid and final judgment on the *Temple* merits. Nor can it be argued that the determination of each of the issues contested in *Temple* was not essential to the district court's judgment. Because each of the elements required for the application of collateral estoppel or issue preclusion was satisfied, and because the invalidation of Pennsylvania's MAP necessarily affected the hospitals in Pennsylvania, we are persuaded that DPW's challenge to the March 1 orders as they pertain to the district court's liability determination voiding Pennsylvania's MAP, is meritless.[16]

We recognize, of course, that the March 1 orders which were entered to give relief to the Hospitals did not attempt to categorize each of the Hospitals by group or classification. Indeed, in these orders, the district court expressly disclaimed any such analysis when it granted relief "for the reasons stated in this court's rulings on interim relief in the case of *Temple University v. John F. White, Jr.*, C.A. 88–6646 ... (to the extent those reasons apply to all hospitals, without regard to their classification or other individual distinguishing features....)." *See supra* note 14. Rather, the thrust of the March 1 orders was to reduce the budgetary adjustment from the arbitrary across-the-board 14% assessed by DPW, to a percentage not to exceed 2.4%. This ruling, based on collateral estoppel, *see supra* note 16, followed from the district court's analysis in *Temple* of the budget neutrality adjustment. *Temple*, 729 F.Supp. at 1098–99; *Temple*, 732 F.Supp. at 1328.

Having concluded that DPW had not complied with the federal statute and regu-

---

**15.** DPW has not argued that the doctrine of collateral estoppel is inapplicable in this case. Indeed, no argument refuting the Hospitals' theory appears in DPW's briefs.

**16.** While the district court did not explicitly base its order on the doctrine of collateral estoppel, it implied as much by basing its interim award on "the reasons stated in this court's rulings on interim relief in [*Temple*] (to the extent those reasons apply to all hospitals, with-

out regard to their classification or other individual distinguishing features)...." *See supra* note 14. We review a district court's application of the doctrine of collateral estoppel only for abuse of discretion. *McLendon v. Continental Can*, 908 F.2d 1171, 1177 (3d Cir.1990). In the context of the district court's rulings which we have reviewed and sustained and the district court's analyses, the district court did not abuse its discretion.

lations governing its participation in the Medicaid Program and that the district court's orders to that effect extended not only to Temple but to the Hospitals, as well, we are satisfied that Temple and the Hospitals properly prevailed on the merits of their challenges to DPW's MAP, and, therefore, that they have met the threshold requirement for an award of injunctive relief against DPW. We turn, therefore, to DPW's remaining challenge to the "interim" injunctive relief which the district court ordered to remedy DPW's violation of Title XIX.

### B

■ The district court styled the remedy in its February 21 and March 1 orders as "interim relief," despite the fact that they followed a final determination of liability, i.e., a holding that DPW had violated Title XIX, and despite the fact that the relief ordered partakes of all the characteristics of a permanent injunction.[17] The parties, DPW on the one hand, and Temple and the Hospitals on the other, have argued that the character of the district court's February 21 and March 1 orders is significant because a difference exists in the standards by which a preliminary injunction and a permanent injunction are tested.

DPW claims that the orders at issue are preliminary injunctions and, as such, that irreparable injury had to be shown in order for the district court to enter its decrees. Moreover, DPW contends that, because no irreparable harm was found by the district court, its decrees cannot be sustained. *See Bill Blass Ltd. v. Saz Corp.,* 751 F.2d 152, 154 (3d Cir.1984). Temple and the Hospitals counter this argument by claiming that the district court's orders constituted permanent injunctions and that as such irreparable harm need not be demonstrated. *See Ciba–Geigy v. Bolar Pharmaceutical,* 747 F.2d 844 (3d Cir.1984). But *see Natural Resources Defense Council v. Texaco,* 906 F.2d 934, 941 (3d Cir.1990).

While we have no difficulty in identifying the injunctive relief at issue here as permanent in nature, *see supra* note 17, we are, however, aware that different views have been expressed from time to time as to the need for establishing irreparable harm as a predicate to the entry of a permanent injunction.[18] Even if we could resolve an

---

**17.** While we have acknowledged that the district court itself referred to the injunctive relief which it ordered as "interim," we read and understand the district court's orders as being "interim" only to the extent that the district court ordered a new MAP to be promulgated, and that the injunctive relief ordered was to continue in force until the new MAP became effective. We do not regard the characterization of "interim" relief as being synonymous with preliminary injunctive relief in the context in which this case has developed.

**18.** *Compare, e.g., Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) (although plaintiff prevailed on merits as to violation of Williams Act, absence of traditional showing of irreparable harm rendered permanent injunction unavailable); *Natural Resources Defense Council,* 906 F.2d at 941 ("[A] district court may issue a permanent injunction ... *only* after a showing both of *irreparable injury* and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest.") (emphasis added) *with, e.g., Roe v. Operation Rescue,* 919 F.2d 857, 867 n. 8 (3d Cir.1990) (enumerating requirements for permanent injunctive relief, and not including irreparable harm among those requirements); *Ciba–Geigy,* 747 F.2d at 850 (where district court has correctly found that plaintiff has succeeded

on the merits, court of appeals "must uphold the permanent injunction in its entirety so long as the balance of equities favors injunctive relief"); 11 Wright & Miller, Federal Practice and Procedure § 2944, at 399–401 & n. 41 (1973 & West Supp.1991) ("[I]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.").

*See also Lewis v. S.S. Baune,* 534 F.2d 1115, 1123–24 (5th Cir.1976) ("In not all cases where petitioner fails to show irreparable injury will he still be denied a *permanent* injunction.") (emphasis in original); *K–Mart Corp. v. Oriental Plaza,* 875 F.2d 907, 914–15 (1st Cir.1989) (for both preliminary and permanent injunction, requirements include a showing of irreparable harm, but "[t]he necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.... [I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable."); *New York State National Organization for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989) ("Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.") (citing *Rondeau,* 422 U.S. at 57, 95 S.Ct. at 2075), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

apparent conflict as to whether a permanent injunction requires the showing of irreparable injury, *compare Roe*, 919 F.2d at 867 n. 8 *with Natural Resources Defense Council*, 906 F.2d at 941, and obviously we cannot,[19] we, nevertheless, can proceed with our analysis because irreparable harm is reflected throughout the present record. Our disinclination to enter this thicket is prompted most importantly by the fact that, regardless of any distinction between the requirements for preliminary injunctions and permanent injunctions, and regardless of differing requirements found in our permanent injunction cases as to irreparable injury, the record here amply demonstrates the presence of irreparable harm.

### C

The order entered by the district court on January 24, 1990, 729 F.Supp. at 1101, upon which all subsequent orders were based, was an injunctive order directing DPW to revise its MAP so that it would comply with all federal requirements. That order, consistent with the district court's opinion of that date, voided the MAP under which DPW had theretofore been operating. 729 F.Supp. 1093. Hence, as of January 24, 1990, no MAP was in place which could provide for any payments, regardless of amount, to Temple or to the Hospitals.[20]

While under other circumstances DPW's argument that "none of the Hospitals had established that they would close their doors without interim relief,"[21] might be persuasive, that argument fails here where Pennsylvania's MAP has been invalidated. Without an approved State plan, there can be no approved rates and, therefore, no

payments available to be made by DPW to the hospitals. *See supra* note 20 (citing 42 C.F.R. § 447.253(g)). This consideration undoubtedly prompted the district court to find, in its February 21, 1990 opinion, that "it is appropriate to grant interim relief to mitigate irreparable loss which the plaintiff would otherwise suffer, pending final action on a revised plan." 732 F.Supp. at 1328.

Thus, whether or not irreparable injury is a requirement for a permanent injunction, the stark fact is that, in the present proceedings, irreparable injury and harm to the hospitals was threatened and became implicit the moment that the district court invalidated Pennsylvania's 1988–1989 MAP. At that point, as we have noted, no further authority existed for payments to the hospitals, thereby depriving Temple and the Hospitals, to the extent that the *Temple* holding applies to them, of Pennsylvania's participation in its funding.

Indeed, the district court, in its February 21, 1990 opinion had observed that 44% of the Medicaid costs were the responsibility of Pennsylvania, with the remaining 56% the responsibility of the federal government. *Temple*, 732 F.Supp. at 1327–28. While we know of no case where the invalidation of a state plan resulted in a complete cessation of payments to the affected hospitals, the thrust of the Medicaid statute, 42 U.S.C.A. § 1396 *et seq.*, would indicate that, absent compliance by a participating state, the inevitable consequence might well be a collapse of such funding. In such circumstances, where Medicaid funding is endangered, we would be hardpressed not to sustain the finding of the district court that Temple and the Hospi-

---

**19.** Our Internal Operating Procedures provide that:

It is the tradition of this court that the holding of a panel in a reported opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a published opinion of a previous panel. Court in banc consideration is required to do so.

Third Circuit I.O.P. 9.1. *See also* I.O.P. Intro. § A(2) (I.O.P.'s are designed to "insure decisional stability and avoid intra-circuit conflict of decisions by ... [providing] that a holding of a published opinion of the court may not be over-

ruled without the approval of a majority of the in banc court[.]").

**20.** The federal regulations governing state payments include the following section:

(g) *Rates paid.* The Medicaid agency *must pay* for inpatient hospital and long term care services using rates determined *in accordance with methods and standards specified in an approved State plan.*

42 C.F.R. § 447.253(g) (emphasis added).

**21.** Supplemental Brief of DPW, at 20.

tals would suffer irreparable harm, if such a showing were indeed required for the issuance of a permanent injunction.

█ The other elements to be considered in decreeing a permanent injunction consist of a showing of success on the merits, the inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest. *See, e.g., Natural Resources Defense Council,* 906 F.2d at 938, 941; *Roe* 919 F.2d at 867 n. 8. Each of these factors is satisfied in this case. As to the merits, Temple and the Hospitals, as we have discussed, had prevailed on the merits of their claim that DPW had not complied with applicable federal laws and regulations and had established payment rates through methods that did not meet federal standards. As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the Commonwealth, *see Temple,* 732 F.Supp. at 1327–28, clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature. *See National Resources Defense Counsel,* 906 F.2d at 938, 941; *Roe,* 919 F.2d at 867 n. 8.

With respect to balancing the equities, even a cursory reading of the district court's January 24, 1990 opinion demonstrates the painstaking care that the district court took in weighing the competing claims and in balancing the interests of Temple, the Hospitals, and the medically needy on the one hand, against the interests of the Commonwealth, on the other. *See Temple,* 729 F.Supp. 1093. Thus, we are satisfied that all the criteria necessary for the injunction decreed by the district court were present.

### D

█ The district court's injunctive remedy consisted of two parts. The first and most fundamental part was the requirement imposed by the district court that DPW promulgate a new MAP. The district court's injunctive order in this respect, directed that DPW "take all necessary steps to bring the Pennsylvania Medical Assistance Plan into compliance with federal re-

quirements consistent with [the district court's January 24, 1990] Memorandum." 729 F.Supp. at 1101. The second part of the district court's injunction required interim payments to be made by DPW to Temple and the Hospitals (to the extent that the Temple February 21, 1990 order pertains to the Hospitals), *see supra* note 14, until the new MAP takes effect. While DPW contends that its present MAP should not have been invalidated, i.e., that DPW should have prevailed on the merits, it also attacks the interim relief which the district court provided in its orders of February 21, 1990 and March 1, 1990.

█ We are satisfied that the district court had inherent discretion to fashion a remedy in aid of, and in implementation of, its own judgment which required DPW to formulate a new MAP. Having determined that a new MAP was required which would provide payment rates to Temple and to the Hospitals in accordance with federal prescriptions, it is evident to us, as it must have been to the district court that, until such time as DPW complied with the January 24, 1990 order and presented a new MAP, provisional payments had to continue so that the medically needy could be served and Temple and the Hospitals could remain effective as providers of medical services. The district court's task, in a situation where a violation of this nature is found, is to correct the condition by balancing the individual and collective interests. *See Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (in a constitutional context). While the scope of a district court's equitable powers to effect a remedy is broad, the relief which a district court may grant can be no broader than that necessary to correct the violation. Indeed, a federal court is required to tailor the scope of its remedy in order to fit the nature of the violation which it has found. *Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). As we said in *Resident Advisory Board,* albeit in a constitutional context, the federal equitable remedy must cure the constitutional

defect, but the dosage must not exceed that necessary to effect the cure. 564 F.2d at 145.

In this case, the district court, recognizing that any acceptable Medicaid plan must be devised by DPW, nevertheless undertook to establish an interim payment level "based upon eliminating only the most obvious and clearcut inadequacies of the present plan." 732 F.Supp. at 1328. It is clear to us that the entire focus of the district court's endeavors, once it had concluded that Pennsylvania's 1988–1989 payment rates were invalid, was to require a new payment rate plan to be formulated by DPW as expeditiously as possible and to protect that judgment by providing for interim payments which would sustain the system until such time as the new MAP was drawn and approved. Having concluded that all the criteria necessary for the injunctive relief ordered by the district court were present, both with respect to the injunctive decree requiring revision of the MAP and with respect to the injunctive decrees providing for interim relief, (particularly because it was evident that some payments had to be ordered to maintain the hospital system and to service the medically needy), we can find no fault with the action taken by the district court or with the orders entered by the district court to effectuate the objectives inherent in the Medicaid Program.

## V

### A

■ On August 14, 1990, the district court, among other things, ordered that DPW make four payments of $500,000 each to Sacred Heart Hospital as an advance against future medical assistance payments. A threshold issue of appellate jurisdiction is presented by this appeal. We are bound to determine our own jurisdic-

tion, even if the parties do not raise this issue. *See Firestone v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 676, 66 L.Ed.2d 571 (1981). In this case, the parties did not call our attention to the jurisdictional problem, and indeed, when that issue was raised, both DPW and Sacred Heart argued that we should not dismiss the appeal for failure of jurisdiction.

■ The district court's August 14, 1990 order was made orally from the bench and was not reduced to writing, nor was it entered on the clerk's docket. At that stage, therefore, we could not obtain appellate jurisdiction to review an unrecorded order. *Banker's Trust v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), relied upon by the parties, is not to the contrary. In *Banker's Trust,* the Court recognized that no order had been written which satisfied the separate document requirement of Fed.R.Civ.P. 58. The Court also recognized, however, that the parties could waive that requirement, and, in so doing, affirmed its appellate jurisdiction over the case. However, the Court took pains to note that there had been an entry of the order in the district court clerk's docket. The Court stated:

> Here, the district court clearly evidenced its intent that the opinion and order from which an appeal was taken would represent the final decision in the case. *A judgment of dismissal was recorded in the clerk's docket.*

435 U.S. at 387, 98 S.Ct. at 1121 (emphasis added). Here, to the contrary, *no entry of the August 14, 1990 order appears in the clerk's docket.* In the absence of both a written order satisfying the "separate document" requirement and in the absence of an entry in the clerk's docket, the notice of appeal, which was filed on September 4, 1990, could not vest jurisdiction in this court despite the parties' apparent waiver of the separate document requirement.[22]

---

**22.** In *Banker's Trust,* the Supreme Court explained the purposes of entering a decision on the docket:

> Because Rule 58 provides that a "judgment is effective only ... when entered as provided in Rule 79(a)," it is arguable that a decision must be entered on the civil docket before it may constitute a "final decision" for purposes of

> § 1291. Unlike the separate-document requirement, ... the keeping of a civil docket pursuant to Rule 79 fulfills a public record-keeping function over and above the giving of notice to the losing party that a final decision has been entered against it.

435 U.S. at 384 n. 4, 98 S.Ct. at 1119 n. 4.

However, an event that occurred subsequent to the August 14 order suffices to satisfy us that we have the right to review DPW's appeal. On August 23, 1990, the district court, in response to a motion filed by Sacred Heart, directed that the order of August 14, 1990, which had been sealed and which is the order under appeal here, be unsealed. Prior to that time, Sacred Heart had succeeded in having its motions to seal the pleadings and record granted. For reasons which do not appear of record, Sacred Heart moved to amend the district court's order dated August 14, 1990 by having the August 14th order unsealed. The order of the district court reads as follows:

AND NOW, this 23rd day of August 1990, upon consideration of Plaintiff, Sacred Heart Medical Center's Motion to Amend this Court's Order dated August 14, 1990 sealing the pleadings and record herein, it is hereby ORDERED AND DECREED that:

Said Order is amended to permit the unsealing of the Order entered by this Court at the end of the Hearing August 14, 1990. A copy of that Order is attached hereto as Exhibit A.

(SH App. 158).

It is significant to us that a copy of the August 14, 1990 order which the court ordered to be "unsealed" was attached to the unsealing order of August 23, 1990 as Exhibit A. The August 23 order *is* entered on the clerk's docket, and although the August 14 order, to which the unsealing order refers, does not appear either on the clerk's docket or in written form in the record, for purposes of appellate jurisdiction, we are satisfied that the entry on the clerk's docket of the August 23 order, with its Exhibit, is sufficient to permit us to review DPW's appeal. We turn, then, to DPW's argument on the merits.

## B

DPW argues first that because the district court erred in invalidating DPW's MAP and in finding that DPW was in violation of Title XIX, as it did in its *Temple*

holding, that Sacred Heart's claim, which is premised on that holding, must also fail. The short answer to this argument is found in our earlier analysis of the district court's *Temple* holding, which was predicated on a failure of DPW to make its findings required by 42 U.S.C.A. § 1396 *et seq.*, and our discussion of collateral estoppel which extended the district court's *Temple* holding to the Hospitals. *See supra* §§ III and IV. We are satisfied that the decision of the district court as to liability must be sustained, and, in sustaining the orders of the district court in this respect, we reject DPW's first argument.

DPW also argues that the district court's decision to grant interim relief for Sacred Heart is against the weight of the evidence, inasmuch as Sacred Heart had a history of financial problems which DPW claims was responsible for Sacred Heart's financial plight, rather than the inadequacy of DPW's MAP. In addition, DPW argues that the district court erred when it directed that DPW make advance payments to Sacred Heart without requiring that a bond be posted pursuant to Fed.R.Civ.P. 65(c). We also briefly address the issue of mootness which was the subject of our inquiry after learning of the Settlement agreements executed by the parties. *See infra* note 5. We turn to these arguments.

### (i)

On August 14, 1990, the district court judge enjoined DPW to pay $2 million in advance payments to Sacred Heart Hospital by directing:

I, therefore, will direct that the defendants pay to the Sacred Heart Hospital beginning within 10 days from today the following sums:

The sum of $500,000.00, the first payment to be made within 10 days from today and a like payment of $500,000.00 each of the next three months for a total of four months of payments or a total of $2 million spread out over the four-month period with the understanding:

No. 1, that this is an advance against future medical assistance payments and the reimbursement of this $2 million in the form of credits against future medical assistance payments will begin January 18th, 1991 or 30 days after submission of an acceptable MAP plan; and

It is further understood that upon presentation of a revised MAP plan, whenever that occurs, the defendants will be at liberty to seek a modification of this order with respect to any advances which have not yet occurred if they can establish that under the appropriate MAP plan the adjustments will not—that these additional payments will not be justified.

(SH App. 155).

The district court ordered this relief in light of underpayment of Medicaid rates to Sacred Heart in past years; DPW's failure to promulgate a new MAP providing for a higher payment rate; and the need "to make some appropriate adjustment for the interim period ... which will prevent the insolvence [sic] or a bankruptcy of Sacred Heart Medical Center at least in that interim period...." (SH App. 154).

As we have noted in an earlier part of this opinion, see supra note 5, sometime subsequent to the filing of the appeals that we consider today, DPW entered into a Stipulation of Settlement with Temple and the Hospitals and into a special agreement with Sacred Heart. The parties to these agreements were satisfied that entering into them did not moot out these appeals or proceedings underlying the appeals, see, e.g., Stipulation of Settlement, p. 33, paragraph 6.5, and indeed, after supplementing the record on these appeals with the settlement documents, and after additional briefing, we, too, were satisfied that the appeals in gross have not been mooted.

Our determination that the appeals were still viable did not reflect the fact, however, that some aspects of the appeals may have been mooted by the action of the parties. In our view, DPW's payments totalling $2 million, payments which had been completed, may very well have mooted DPW's

argument that the district court erred in directing those payments, particularly because we understand that the agreement which DPW made with Sacred Heart would now govern the relationship of the parties with respect to those payments.

## (ii)

However, we do not rest our decision on the ground of mootness, for we are satisfied that the standard by which a district court's decree of injunction is tested—whether the district court properly exercised its discretion—was not abused in this case. First, as we have observed, Sacred Heart has succeeded on the merits of its claim. Second, whether or not irreparable harm is deemed a factor in the injunction analysis, as DPW claims that it is, irreparable harm has been more than demonstrated by the finding made by the district court that without emergency relief, Sacred Heart would become insolvent. (SH App. 154).

The district court further noted that even DPW did "not dispute the fact that, if a stay [of the emergency relief award] is granted, financial collapse of the Sacred Heart Medical Center is virtually certain to occur." (SH Supp.App. 5). While DPW did not dispute the fact that Sacred Heart was in severe financial straits, it did dispute the district court's finding that Sacred Heart's potential financial collapse/insolvency was related to DPW's MAP. The district court, however, found otherwise, and we cannot hold that finding to be clearly erroneous in light of the district court's determination that Sacred Heart's financial "inefficiencies" are insignificant. (SH App. 155).

A fair reading of the district court's October 18, 1990 memorandum reveals that the district court weighed the risks to DPW,[23] and balanced the interests of Sacred Heart, DPW, and the public in requiring the advance payments to be made to Sacred Heart. From any standpoint, and particularly considering the fact that no legal remedy was either adequate or avail-

---

**23.** "The risk that the defendants will suffer any significant prejudice as a result of these interim payments is, for the reasons mentioned above, very slight or non-existent." (SH Supp.App. 6).

able, we conclude that the district court's injunctive order was well within its broad discretionary power. Hence, even if by completing payments of the $2 million advance and the execution of the settlement agreements, the issues presented by the DPW were not moot, the injunction itself, as entered by the district court, was not an abuse of discretion.

### (iii)

■ DPW argues that the district court erred in awarding emergency relief to Sacred Heart without requiring it to post a bond pursuant to Fed.R.Civ.P. 65(c).[24] While Rule 65(c) does state that a plaintiff shall post a security bond before a district court may grant a preliminary injunction, we have acknowledged, on several occasions, that there may be instances in which a strict reading of Rule 65(c) would be inappropriate.[25] While we have not previously addressed a situation where the bond requirement of Rule 65(c) could properly have been waived, we note that several other circuits have held that a district court

may dispense with that requirement under certain narrowly drawn circumstances.[26]

In particular, the First Circuit has articulated an appropriate analysis that a district court should employ in deciding whether or not to require a bond. *Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). "First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Id.* at 1000. Here, Sacred Heart was on the brink of financial ruin and would have become insolvent absent the relief which the district court ordered. Furthermore, the district court found that virtually no risk existed for DPW in advancing funds to Sacred Heart, because of the probability that the hospital would be entitled to as much or more monies pursuant to DPW's new MAP. The emergency relief itself ensured Sacred Heart's financial solvency, and DPW could recoup any overpayment of funds by withholding on future payments to Sacred

---

24. Fed.R.Civ.P. 65(c) provides in relevant part as follows:

 (c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

25. *See Hoxworth v. Blinder, Robinson & Co. Inc.*, 903 F.2d 186, 211 n. 32 (3d Cir.1990) (noting that if an exception to the bond requirement is drawn, it "should be drawn narrowly"); *Instant Air Freight v. C.F. Air Freight*, 882 F.2d 797, 803 n. 8 (3d Cir.1989) (recognizing that "[o]ther courts of appeal have held that certain noncommercial and public interest cases may require dispensing with the bond"); *System Operations v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1146 (3d Cir.1977) (adding that there was no need to "decide whether a court may dispense with the posting of a bond in a case where the injunction raises no risk of monetary harm to the defendant"). *Cf. Frank's GMC Truck Center v. G.M.C.*, 847 F.2d 100, 103 (3d Cir.1988) (noting that "[w]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory").

26. *See, e.g., Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (upholding denial of bond where Union members would have had financial difficulty posting it, and where defendants faced low burden from absence of security); *International Controls v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (noting that "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined") (citations omitted); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300 (5th Cir.1978) (trial court may elect not to require security bond where entire purchase price of disputed sale was paid into registry of court); *Urbain v. Knapp Brothers Mfg.*, 217 F.2d 810 (6th Cir.1954) (no bond required where defendant would not appear to face material damage); *Wayne Chemical v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir.1977) (no bond required from indigent plaintiff); *People ex rel. v. Van De Kamp v. Tahoe Regional Plan*, 766 F.2d 1319 (9th Cir.1985) (holding non-profit environmental group would be denied access to judicial review if court did not properly exercise its discretion to dispense with security requirement); *Continental Oil v. Frontier Refinery*, 338 F.2d 780 (10th Cir.1964) (no bond required where likelihood of harm to defendant is absent).

Heart. The equities of potential hardships to the parties, therefore, weighed in favor of waiving the bond requirement.

The First Circuit also noted the special nature of suits to enforce important federal rights or " 'public interests,' " arising "out of comprehensive federal health and welfare statutes." *Crowley,* 679 F.2d at 1000. A district court should consider the impact that a bond requirement would have on enforcement of such a right, in order to prevent undue restriction of it. *Id.* In this case, Sacred Heart has sued to enforce the rights granted to it under the federal Medicaid statute, and in so doing has pursued a course of litigation clearly in the public interest, i.e., it seeks to preserve its role as a community hospital serving a disproportionate share of low income patients.[27] In light of the district court's discussion, it appears improbable that, had the district court required Sacred Heart to post a bond, the hospital would have been able to do so. Moreover, had Sacred Heart suffered a financial collapse, it would have been in no position to pursue its claim for increased Medicaid payments, or even to serve its Medicaid patients. The district court's waiver of the bond requirement under these circumstances, then, falls within the exception to Rule 65 formulated by the First Circuit—an exception which we adopt today.[28]

### VI

We have sustained the district court's invalidation of Pennsylvania's MAP, providing for 1988–1989 payment rates, and the remedies ordered by the district court, including the district court's requirement that a new MAP be devised which complies with all requirements of Title XIX. We have also upheld the interim remedies fashioned by the district court which will remain in effect until DPW complies with the district court's order of January 24, 1990. With respect to Sacred Heart, we have sustained the district court's order for advance payments which were to be made without bond. Accordingly, the district court's orders of January 24, 1990 (Temple); February 21, 1990 (Temple); March 1, 1990 (Hospitals); August 14, 1990 (Sacred Heart); and August 23, 1990 (Sacred Heart) will be affirmed in all respects.

---

**27.** Public policy under [federal law governing state modification of Medicaid programs] mandates that parties in fact adversely affected by improper administration of programs pursuant thereto be strongly encouraged to correct such errors.... [T]he allocation of risk for not complying with federal law in a comprehensive program to promote national health ... properly rests upon the defendant governmental bodies whose administration of the program is at issue. *Bass v. Richardson,* 338 F.Supp. 478, 491 (S.D.N.Y.1971) (waiving the Rule 65(c) bond requirement).

**28.** Because we have upheld the district court's injunction requiring the payment of advances to Sacred Heart, even if we had not adopted an exception to Rule 65 and had, therefore, concluded that the district court had erred in not requiring a bond, DPW would only have been entitled to a remand for reconsideration of that issue. *See Crowley,* 679 F.2d at 1000. The district court could have, at that point, required the posting of a nominal bond, and the case would have proceeded apace. *See Frank's GMC,* 847 F.2d at 103 (noting that "the amount of the bond is left to the discretion of the court").